**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 08-4415

———

UNITED STATES OF AMERICA

v.

REIDAR CARROLL ARDEN
also known as
SHANE DOYLE
also known as
R C ARDEN
also known as
WILLIAM McGINNIS
also known as
DAVID ADAMS,

Reidar Carroll Arden,

Appellant

———

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2:98-cr-00379)
District Judge: Honorable Gene E.K. Pratter

———

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
June 24, 2011

Before: BARRY, AMBRO, and VAN ANTWERPEN, *Circuit Judges*

(Filed June 24, 2011)

———

_____

VAN ANTWERPEN, *Circuit Judge*.

Reidar Carroll Arden operated a fraudulent telemarketing scheme leading to his conviction by a jury for conspiracy to transport stolen checks, transporting stolen checks, and money laundering. Arden appeals his conviction and sentence. We will affirm.

I.

On August 13, 1998, a grand jury returned an indictment charging Arden with one count of conspiracy to engage in the interstate transportation of stolen checks in violation of 18 U.S.C. § 371 (Count 1), four counts of interstate transportation of stolen checks in violation of 18 U.S.C. § 2314 (Counts 2-5), and eight counts of money laundering in violation of 18 U.S.C. § 1956 (Counts 6-13). Trial commenced on October 15, 2008. The facts at trial showed that from the spring of 1993 through the spring of 1994, Arden owned and operated a fraudulent telemarketing company. One of Arden's schemes was to telephone elderly victims, inform them they had won two out of five prizes in a contest,[1] and then solicit an "administrative fee" of $299 to $2,499 to receive their prizes. Arden's employees instructed the victims to send the "administrative fee" check to one of the company's various mail drop addresses located in Carson City, Nevada, Atlanta, Georgia, or Philadelphia, Pennsylvania. No victim ever received any prizes.

---

[1] The "prizes" included a Coleman Newport Travel Camper or $5,000 cash, a four-diamond watch, a Skeeter Fishing Boat or $12,000 cash, a luxury cruise to the Bahamas, or a Dodge Stealth or $20,000 cash.

Arden's telemarketers also used a second scheme known as "coin pitch."  In "coin pitch," telemarketers informed victims they had won thousands of dollars worth of gold coins and that the organization could "liquidate" the coins to a buyer and pay the victim the "liquidation proceeds."  The victim had to pay a "liquidation fee" to the organization. No victim ever received "liquidation proceeds."

As part of the money laundering scheme, in late December 1993, Arden (using a pseudonym) contacted an incorporating service in Nevada and established "Hanover and Hanover, d/b/a American Liberty Group" ("ALG").  ALG opened a bank account in Las Vegas, Nevada, and Arden began forwarding the victims' checks to ALG's account for deposit.  Arden then wired funds from ALG's bank account to coin dealerships in California to purchase untraceable gold coins, including American Gold Eagles, Canadian Maple Leafs, and South African Krugerrands.  According to the testimony of David Godin, Arden's employee and co-conspirator, the gold coin purchases not only effectively laundered the illegal proceeds derived from the telemarketing scheme but also gave the appearance that ALG engaged in the legitimate purchase and sale of gold coins.

Eventually, Special Agent Robert Geary of the United States Treasury Department reviewed bank and check cashing records and determined that 260-300 individuals from 48 states had sent checks totaling $440,000 to Arden.  Bank records confirmed that approximately $175,000 in checks had been deposited in ALG's bank account and that a total of $110,800 was wired from ALG's account to California coin shops.

On October 24, 2008, the jury convicted Arden on all counts.  Arden orally moved for judgment of acquittal at the close of the Government's case and after the jury returned

3

its guilty verdict. The District Court reserved judgment. On October 30, 2008, Arden filed a written post-trial Motion for Judgment of Acquittal and/or New Trial pursuant to Federal Rules of Criminal Procedure 29 and 33. After the court granted Arden's request to dismiss his trial counsel, Arden's new counsel filed a Supplemental Motion for Judgment of Acquittal. On July 7, 2009, the District Court denied Arden's post-trial motions in a written opinion. On July 21, 2009, the District Court sentenced Arden to 96 months' imprisonment, three years' supervised release, a $3,000 fine, and a $1,300 special assessment. Arden timely appealed his conviction and sentence on July 22, 2009.

## II.

The District Court had jurisdiction pursuant to 18 U.S.C. § 3231, and we have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). As to Arden's challenge to the sufficiency of the evidence, "we must sustain the verdict if a rational trier of fact could have found [the] defendant guilty beyond a reasonable doubt, and the verdict is supported by substantial evidence." *United States v. McKee*, 506 F.3d 225, 232 (3d Cir. 2007) (internal quotation marks omitted). "[T]he jury is entitled to draw reasonable inferences from the trial evidence," *United States v. Vosburgh*, 602 F.3d 512, 537 (3d Cir. 2010), and "[w]e review the evidence in the light most favorable to the government," *McKee*, 506 F.3d at 232. Finally, insofar as Arden's appeal raises a legal issue of statutory interpretation, we exercise plenary review. *See United States v. Omoruyi*, 260 F.3d 291, 294 (3d Cir. 2001).

## III.

Arden argues the evidence was insufficient to sustain convictions for both money laundering (Counts 6-13) and interstate transportation of stolen checks (Counts 2-4).

A.

The jury convicted Arden on eight counts of money laundering in violation of 18 U.S.C. § 1956(a)(1). To establish the offense of money laundering, the Government must prove four elements:

> (1) an actual or attempted financial transaction; (2) involving the proceeds of specified unlawful activity; (3) knowledge that the transaction involves the proceeds of some unlawful activity; and (4) . . . knowledge that the transactions were designed in whole or in part to conceal the nature, location, source, ownership, or control of the proceeds of specified unlawful activity.

*Omoruyi*, 260 F.3d at 294-95. The trial evidence was sufficient to support Arden's money laundering convictions on Counts 6-13. The trial evidence showed that Arden masterminded a telemarketing scheme, fraudulently obtained checks from victims, transported these stolen checks in interstate commerce in violation of 18 U.S.C. § 2314 (a "specified unlawful activity"), and knowingly concealed the proceeds from the telemarketing scheme by using the proceeds in transactions to purchase untraceable gold coins. *Supp. App.* 22-24, 343-60. Based on this evidence, a rational juror could have concluded that Arden committed money laundering.

Nonetheless, Arden contends that to sustain a conviction for money laundering, the Government must prove the transacted proceeds were "in fact" derived from the "specified unlawful activity" alleged in the indictment. 18 U.S.C. § 1956(a)(1). Arden reads § 1956(a)(1) to require the Government to trace the transacted proceeds directly to

5

the *same* stolen checks listed in Counts 2-5 of the indictment. Arden's overly rigorous interpretation of the money laundering statute is contrary to law, and we reject it.

At least when the transactions are part of a broader scheme to launder illegal proceeds, the Government need not directly trace the transacted funds to a distinct specified unlawful activity to prove a violation of 18 U.S.C. § 1956. *See United States v. Fernandez,* 559 F.3d 303, 315 (5th Cir. 2009) ("[T]he prosecution is under no duty to trace the individual funds involved in particular transactions, or to examine a transaction wholly in isolation if the evidence tends to show that it is part of a larger scheme that is designed to conceal illegal proceeds.") (internal quotation marks omitted); *United States v. Jamieson,* 427 F.3d 394, 404 (6th Cir. 2005) ("[T]he circuits have almost unanimously held that § 1956 money-laundering charges do not require the government to trace the monies to specific unlawful activity."). Here, the Government amply proved the transacted funds were the proceeds of Arden's fraudulent telemarketing scheme and that these proceeds derived from specified unlawful activity, namely the interstate transportation of stolen checks in violation of § 2314. Bank records indicated Arden deposited $175,000 in stolen checks into the ALG bank account, $110,000 of which was then used to purchase gold coins. Finally, no evidence suggested that any aspect of Arden's "business" was legitimate; *all* of the proceeds derived from specified unlawful activity. Therefore, we reject Arden's interpretation of § 1956(a)(1). The Government was required to prove only that the transacted proceeds derived from a specified unlawful

6

activity. A rational juror considering this evidence could have concluded that the Government met its burden.[2]

B.

Arden next contends there was insufficient evidence to convict him on three counts of interstate transportation of stolen checks in violation of 18 U.S.C. § 2314. This argument is meritless.

To sustain a violation of § 2314, the Government must prove the following elements: (1) the defendant transported property – "securities or money," 18 U.S.C. § 2314 – in interstate commerce; (2) the property was worth $5,000 or more; and (3) the defendant knew the property was "stolen, converted or taken by fraud." *Dowling v. United States*, 473 U.S. 207, 214 (1985). Individual checks valued at less than $5,000 may be aggregated for purposes of § 2314 if such checks can be joined in a single count of the indictment as a "single offense." *See United States v. Markus*, 721 F.2d 442, 444 (3d Cir. 1983) (quoting *Schaffer v. United States*, 362 U.S. 511, 517 (1960)). The Government met its burden of proof as to Counts 2, 3, and 4.

Regarding Count 2, the Government alleged that Arden violated § 2314 by transporting five separate checks obtained by fraud in interstate commerce whose

---

[2]   Arden also contends his conviction for conspiracy to transport stolen checks in violation of 18 U.S.C. § 371 (Count 1) cannot be a "specified unlawful activity" as required to prove a money laundering offense under 18 U.S.C. § 1956(a)(1). We need not decide this issue here. In addition to his conspiracy conviction, the jury convicted Arden on four counts of interstate transportation of stolen checks in violation of 18 U.S.C. § 2314 (Counts 2-5). Arden concedes that a violation of § 2314 is a "specified unlawful activity." Def. Br. 22. Accordingly, Arden's convictions on Counts 2 through 5 (which we affirm, *see infra* Section B) satisfy the "specified unlawful activity" element of a money laundering offense.

7

aggregate value exceeded $5,000.[3] Arden argues the Government failed to prove the

third element, that the five checks were in fact "stolen, converted or taken by fraud."

*Dowling*, 473 U.S. at 214. On this point, Arden concedes the Government introduced

three of the five checks into evidence: two checks from Frederick Bunce totaling $1,720

and a check from Orville Grauerholz for $2,500. Nevertheless, Arden contends the

Government failed to meet the $5,000 threshold by failing to introduce a $3,000 check

from Celestia Walters. While the Government did not formally introduce Walters'

$3,000 check into evidence, telemarketer Gerald Gittelson testified that he remembered

soliciting money from Celestia Walters, that she was a "high dollar" person, and that she

sent $3,000 based on his solicitation. *Supp. App.* 86, 89, 92-93. Arden persists that

Gittelson's testimony did not prove Walters sent the $3,000 by *check* as Count 2 alleged.

But a rational juror viewing the evidence in the light most favorable to the Government

could have inferred that Walters sent the $3,000 by check. For example, Melinda

Valencia, Arden's office manager, testified that the clients (*i.e.*, the victims) sent checks

or money orders and that the office received between $13,000 and $15,000 in checks per

day. *Supp. App.* 130-31. Additionally, Gittelson testified that another victim he solicited,

---

[3]      Arden concedes the Government properly aggregated the five checks to exceed the $5,000 jurisdictional threshold. Def. Br. 29. Count 2 of the indictment lists the five aggregated checks:

    (1) Celestia Walters, $3,000
    (2) Frederick Bunce, $720
    (3) Frederick Bunce, $1,000
    (4) Orville Grauerholz, $2,500
    (5) Leota C. Burrows, $390.

8

Orville Grauerholtz, sent a check to ALG. *Supp. App.* 90-91. There is, moreover, no evidence in the record that Arden's companies received money from victims in any form *other than* by check. Based on this evidence, a rational jury could have inferred that Walters sent the $3,000 by check. Together, Walters' $3,000 check, Orville Grauerholz's $2,500 check, and Frederick Bunce's two checks totaling $1,720 exceed the $5,000 jurisdictional threshold.[4] Accordingly, Arden's Count 2 conviction will be affirmed.

Counts 3 and 4 also alleged violations of § 2314. Each count relied on one of two $5,000 checks written and sent to ALG by George Kempf. *App.* 52. Arden argues that there was insufficient evidence to prove that Kempf in fact sent the two $5,000 checks listed in Counts 3 and 4 because the checks introduced into evidence by the Government "differ significantly" from the checks listed in the indictment. For example, Count 3 alleges Arden caused Kempf to issue check number "1056" for $5,000 dated "11/11/93." *Id.* Count 4 alleges Arden caused Kempf to issue check number "1057" for $5,000 dated "11/11/93." *Id.* At trial, the Government admitted two $5,000 checks sent by Kempf, a check numbered "0157" dated November 23, 1993 and a check numbered "0156" dated November 23, 1993. *Supp. App.* 493-94.

Arden's argument requires us to consider whether the inconsistencies between the indictment and trial evidence constitute a "constructive amendment" or a "variance" of the indictment. "An indictment is constructively amended when, in the absence of a formal amendment, the evidence and jury instructions at trial modify essential terms of

---

[4]     The Government did not seek to offer Leota Burrows' $390 check into evidence, nor did it offer testimony about it. Even without this check, the checks aggregated in Count 2 exceed the $5,000 threshold.

the charged offense in such a way that there is a substantial likelihood that the jury may have convicted the defendant for an offense differing from the offense the indictment returned by the grand jury actually charged." *United States v. Vosburgh*, 602 F.3d 512, 532 (3d Cir. 2010) (quoting *United States v. Daraio*, 445 F.3d 253, 259-60 (3d Cir. 2006)). A constructive amendment constitutes a Fifth Amendment violation because "a court cannot permit a defendant to be tried on charges that are not made in the indictment against him." *Daraio*, 445 F.3d at 260 (quoting *Stirone v. United States*, 361 U.S. 212, 217 (1960)). In short, the "key inquiry is whether the defendant was convicted of the same conduct for which he was indicted." *Id*. (quoting *United States v. Robles-Vertiz*, 155 F.3d 725, 729 (5th Cir. 1998)).

In contrast, a variance occurs "'where the charging terms [of the indictment] are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment.'" *Id*. at 261 (quoting *United States v. Castro*, 776 F.2d 1118, 1121 (3d Cir. 1985)); *McKee*, 506 F.3d at 231 n.7. Variances implicate due process protections, as a defendant must receive notice of the charges against him and not be surprised or prejudiced at trial. *See Daraio*, 445 F.3d at 261-62; *Kotteakos v. United States*, 328 U.S. 750, 757-58 (1946); *United States v. Schurr*, 775 F.2d 549, 553-54 (3d Cir. 1985). Accordingly, to reverse a conviction due to a variance, a defendant "must show (1) that there was a variance between the indictment and the proof adduced at trial and (2) that the variance prejudiced some substantial right." *United States v. Balter*, 91 F.3d 427, 441 (3d Cir. 1996). But "[a] variance does not prejudice a defendant's substantial rights (1) if the indictment sufficiently informs the defendant of the charges against him so that he

10

may prepare his defense and not be misled or surprised at trial, [or] (2) if the variance is not such that it will present a danger that the defendant may be prosecuted a second time for the same offense." *United States v. Schoenhut*, 576 F.2d 1010, 1021-22 (3d Cir. 1978); *see Daraio*, 445 F.3d at 262.

Here, the differences between the charges in the indictment and the trial evidence were slight discrepancies in check numbers and dates. For example, the indictment listed checks "1056" and "1057," but the Government admitted checks numbered "0156" and "0157." Similarly, the indictment listed the checks' dates as "11/11/93" while the date on both admitted checks was "11/23/93." Such "minor clerical errors or misnomers" do not rise to the level of a constructive amendment. *United States v. Kegler*, 724 F.2d 190, 194 (D.C. Cir. 1983). Moreover, these inconsistencies did not constructively amend the indictment because they "would not modify the elements of the crime charged." *Vosburgh*, 602 F.3d at 534 (internal quotation marks omitted). Notwithstanding these discrepancies, the jury convicted Arden of the same conduct – interstate transportation of stolen checks in violation of § 2314 – as the Government alleged in the indictment. Therefore, these discrepancies do not rise to the level of constructive amendment.

These discrepancies are better categorized, at most, as non-prejudicial variances. Arden received a copy of the indictment and copies of both checks prior to trial. Moreover, Arden never claimed to be surprised or prejudiced by this variation. Arden did not raise his constructive amendment and variance arguments until his post-conviction Motion for Judgment of Acquittal, implying that he was not surprised during trial. *See id*. at 535-36 ("If [defendant] really had been surprised by the government's

11

change of course during closing argument, we think it likely that [defendant] would have said something at trial."). Finally, the checks listed in the indictment sufficiently informed Arden of the basis for the charges levied against him. Therefore, the minor discrepancies between the indictment and the trial evidence were, at most, non-prejudicial variances.

IV.

For the foregoing reasons, we will affirm Arden's conviction and sentence.

12